IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                   :
                                         :
WESTERN IMAGING SERVICES, INC.           :     Case No. 01-03693 (GAC)
                                         :
            Debtor                       :     CHAPTER 11
_____:
                                         :
WESTERN IMAGING SERVICES, INC.           :
                                         :
            Plaintiff                    :
                                         :
            v.                           :     Adv. No. 05-00044
                                         :
STATE INSURANCE FUND CORPORATION,        :
                                         :
                                         :
            Defendant                    :
_____:


**<u>DECISION AND ORDER</u>**

<u>Background</u>

The issue pending before this Court is whether there has been a material breach of a Settlement Agreement, entered into between the debtor, Western Imaging Services, Inc. ("Western") and the State Insurance Fund ("SIF"), known in the Spanish language as Corporacion del Fondo del Seguro del Estado, entitling Western to damages.

Since approximately 1990, Western has had various contracts with SIF to provide radiological services.  On March 29, 2001, Western filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  As part of a Settlement Agreement, effective March 14, 2002, the parties agreed that Western would provide the following: radiological equipment, including X-Ray machines,

Magnetic Resonance Imaging ("MRI") machines, and Computerized Tomography Scan ("CT Scan") equipment; the radiologist to evaluate the test results[1]; all materials required for the production and interpretation of the diagnostic tests; and maintenance and repairs of Western's radiological equipment. (See dkt. #33 and Joint Exhibit #2, 1999 Executory Service Contracts for Carolina, Mayagüez, and Ponce; Docket #54 in Adv. No. 01-00041, Settlement Agreement).

In turn, SIF would provide the facilities and necessary personnel, including radiological technicians, secretaries, receptionists and transcriptionist. Moreover, SIF is obliged to refer all patients to Western in first order, with the testing taking place at SIF's regional offices in Mayagüez, Carolina, and Ponce.

Under the Settlement Agreement, three executory service contracts were assumed and incorporated by reference ("Executory Contracts"), including: Carolina No. 99-01196; Ponce No. 99-01197; and Mayagüez No. 99-01198 (Docket #54 in Adv. No. 01-00041, ¶ 12; ¶ 13). The Settlement Agreement includes: the procedures to be followed by SIF in reconciling outstanding pre-2001 and post-2001 invoices, and for the payment of future invoices submitted by Western to SIF (Id. at ¶ 21 through ¶ 26); procedures governing

---

[1]The radiologist in-charge of interpreting all the films is the president and owner of Western, Dr. Tomas Irizarry Concepcion.

2

the patient referral process (Id. at ¶ 30);[2] and other general provisions (Id. at ¶ 33 through ¶ 43).  The contracts will expire on June 30, 2007.

Western filed a previous adversary proceeding against SIF (Adv. No. 01-0041), alleging damages for violation of the Settlement Agreement.  After a trial held on March 4 and 5, 2004, the Court issued a Decision and Order requiring SIF to pay Western damages for loss of revenue in the amount of $2,238,081.51.

On March 11, 2005, Western filed the present adversary proceeding against SIF seeking lost revenue in the amount of $3,000,000.00, for non-compliance with the Settlement Agreement beginning on December 18, 2003.  Western also seeks damages for loss of commercial credibility before its creditors in the amount of $1,000,000.00 and claims that as a result of SIF's negligent acts and omissions, Western's property has been lost or damaged in the amount of $1,000,000.00.  Western also seeks to enjoin SIF from further non-compliance with the Settlement Agreement and for the Settlement Agreement to be extended for a period equal to the period of SIF's non-compliance.

---

[2]The provision related to the patient referral process incorporates by reference, paragraph "J" of the first section of the Executory Contracts. Paragraph J, also described as the exclusivity clause, states that "THE CORPORATION will refer all its patients in the first order to the PROVIDER and if it does not have its equipment and personnel available for the required tests, THE CORPORATION will send and refer its patients to outside providers." (emphasis added) (Docket #54 in Adv. No. 01-00041).

Western initially contended that SIF routinely referred patients to outside providers and allowed outside providers to pick up patients at the contracted facilities to be driven to other facilities. Western also argues that SIF fails to promptly reestablish referrals to Western when services have been interrupted; that there is not adequate personnel to conduct the radiological tests nor to transcribe the results; and that SIF has failed to provide adequate security, with the foreseeable result that equipment has been stolen or damaged.

SIF contends that Western failed to comply with its obligations under the Settlement Agreement and that any damages are attributable exclusively to Western. SIF also argues that Western failed to maintain its equipment in operating condition and contends that on occasion patients have been referred to outside providers due to Western's inability to provide the services required. SIF also maintains that Western fails to comply with the period established to interpret radiological tests as established in the contracts and that it provides the necessary employees, available to it, to carry out the radiological services.

The parties filed a joint motion including the proposed pre-trial report (dkt. #33). In the pre-trial, Western indicates that its lost revenues are reasonably estimated to be $2,417,183.00, the damages for loss of commercial credibility amount to $1,000,000.00

4

and the value of property lost or damaged amounts to the estimated amount of $165,000.00.

Thereafter, SIF filed a motion for partial summary judgment (dkt. #36) and a statement of uncontested facts (dkt. #37). SIF also filed a motion requesting that the Court deem as admitted the facts averred in the statement of uncontested facts (dkt. #45). SIF contends that pursuant to the deposition of Western's president, Dr. Tomas Irizarry Concepcion ("Irizarry"), the allegation of the under staffing problem is limited to the Mayagüez region; that during the time period in controversy, no patients have been transported to outside providers or to other SIF regions; that the alleged lack of transcribers has not caused Western any loss of income; that there was only one incidence of stolen or vandalized equipment in the Ponce region, which was covered by insurance; and that Western has failed to maintain the equipment, with some equipment out of service for prolonged periods of time.

Western opposed the motion for summary judgment (dkt. #46) and filed its own statement of uncontested facts (dkt. #47). Western contends that the staffing problem is mostly in Mayagüez and admits that Carolina and Ponce have a full staff. Western admits that there is no evidence that SIF allowed patients to be transported to other facilities or other SIF regions and thus that the dismissal of this allegation is warranted. Western likewise admits that there is no actual loss of income as a result of a lack of

transcribers, but complains that Western is charged with breaching the Settlement Agreement when reports are late due to unavailability of transcribers. Western contends that the failure to provide adequate security is limited to the Ponce region. Western indicates that the down time of equipment is related to the availability of parts and service.

The trial of this matter was held on February 1, 2, 3 and 6 and concluded on March 6, 2006, at which time the parties presented their remaining evidence and closing arguments. At the final hearing, the Court disallowed the testimony of Leroy Lopez Morales as a rebuttal witness for SIF, since Mr. Lopez had previously performed services for Western. The Court took SIF's motion for partial summary judgment and the matter of the calculation of damages under advisement and granted the parties time to file memorandums, which were filed by both parties on March 20, 2006 (dkts. #50 and #51).

DISCUSSION

In order to decide the controversies in the present case, the Court must look to local law. "Property and contract rights implicated in bankruptcy disputes are determined in accordance with state law." In re Ward, 194 B.R. 703, 711, n.21 (Bankr. D.Mass. 1996)(citing Butner v. United States, 440 U.S. 48 (1979); Ralar Distribution., Inc. v. Rubbermaid, Inc. (In re Ralar Distrib., Inc.), 4 F.3d 62, 67-68 (1st Cir. 1993)). Thus, the laws of the

Commonwealth of Puerto Rico govern the breach of contract and damages claims. Specifically, the Puerto Rico Civil Code ("Civil Code") and interpretive case law determine issues relating to the burden of proof: what has to be proven, by whom, and to what degree of persuasion.

Obligations from contracts have legal force between the parties and must be fulfilled in accordance with their stipulation. 31 L.P.R.A. § 2994. Although "the failure to perform any term of a contract is considered a breach, a party is liable for damages resulting only from a <u>material breach</u>." (emphasis added) 17 Am. Jur. 2d Contracts § 706. In the present case, Western has the burden of proof and must show that SIF materially breached the Settlement Agreement. In order for a breach to be considered "material," it must relate to a matter of vital importance; go to the essence of the contract; or defeat an essential purpose of the contract. <u>Prozinski v. Northeast Real Estate Services, LLC</u>, 59 Mass. App. Ct. 599 (2003). "The court should not view any breach of contract in isolation, but rather must consider the *totality of the breaches and overall effect on the purpose of the contract on the nonbreaching party*." <u>In re De Rosa</u>, 98 B.R. 644, 648 (Bankr. D.R.I. 1989)(emphasis added)(<u>citing</u> <u>In re Best Film & Video Corp.</u>, 46 B.R. 861, 873 (Bankr E.D.N.Y. 1985)).

If the Court concludes that there has been a material breach of contract, the Civil Code recognizes that the damages arising

from the breach are compensable. Computec Systems Corp. v. General
Automation, Inc., 599 F.Supp. 819, 826 (D.P.R. 1984). The Code
provides that compensation includes profits which the creditor may
have failed to realize. 31 L.P.R.A. § 3023. Applicable case law
also recognizes that if damages are sufficiently proven, there can
be compensation. Riofro Anda v. Ralston Purina Company, 772
F.Supp. 46 (D.P.R. 1991)(citing Noble v. Corporacion Insular de
Seguros, 738 F.2d 51 (1st Cir. 1984); Computec Systems Corp. v.
General Automation, Inc., 599 F.Supp. at 827; Carrasquillo v.
Lippitt & Simonpietri, Inc., 98 D.P.R. 659 (1970)). Moreover, an
action for damages can prosper if their reality and "the direct
relation . . . with the facts giving rise to them" are justified.
Rutledge v. Gill, 78 D.P.R. 698, 713 (1955).

Notwithstanding an injured party's entitlement to damages for
a material breach of contract, under the Puerto Rico general law of
damages, an injured party is obligated to mitigate or contain the
damages suffered, unless it is impossible for claimant to do so.
See Fresh-O-Baking Company, Inc. v. Molinos de Puerto Rico, Inc.,
103 D.P.R. 509, 520-21 (1975); Sociedad de Gananciales v. Jeronimo
Corp., 103 D.P.R. 127, 134 (1974); Aponte v. Cortes Express &
Insurance Co. of Puerto Rico, 101 D.P.R. 31, 36 (1973).

Thus, in the present case, as recognized by Western, it must
demonstrate a material breach of contract related to SIF's referral
of patients to outside providers in violation of the exclusivity

8

clause of the settlement agreement, which will entitle it to damages, as measured by the losses resulting from the improper referrals, offset by the losses caused by Western's failure to maintain its equipment.

First, it is necessary to understand SIF's appointment process to determine whether there are legitimate reasons for significant outside referrals, beyond that accounted for by equipment failure, that are not in breach of contract, such as excess capacity for particular dates or appointments made when the equipment is not functioning.

Adela Jouvert Vazquez ("Jouvert"), the supervisor of medical appointments in Ponce, testified as to the process of scheduling appointments for the injured.[3]  She testified that all tests, except those requiring contrast, are referred to Western in first order.  She testified that they were booking two to three weeks into the future.  Jouvert also testified that if the equipment is not functioning, she retains the referral for five days and if the equipment is repaired within those five days, the injured is again scheduled at Western.  Dkt. #44, p. 147-48, 166, 176-77.  Likewise, she testified that when a machine is out of service, the appointments already scheduled will remain on schedule until the

_____

[3]SIF made an offer of proof, which was accepted, that the appointments directors of Mayagüez, William Bidro, and of Carolina, Agnes Hernandez de Hermosa, would have testified exactly like Jouvert.  i.e. that they utilized the same procedures as to referrals and the scheduling of appointments.  Dkt. #44, pp. 179-81.

appointment date. If the machine is still not functioning, then the five day period would run for that patient. If the equipment is repaired within the five days, the patient will be rescheduled with Western. However, if the repairs are not concluded within five days of the scheduled appointment, the patient is referred to another provider. Id.

The Court concludes that if SIF's explanation of the appointment process is accurate, there can be no excess capacity, since the appointments continue to be made further into the future. SIF makes the appointments and controls the number of patients and studies for each type of modality that are referred on a daily basis. If a particular date is full, SIF makes appointments for a later date. Likewise, when a particular piece of equipment is not functioning, while Western losses the appointments scheduled for the actual date that the equipment is not functioning, SIF continues to schedule its patients for appointments at Western as if the equipment were functioning. Thus, irrespective of whether a particular machine is down for a few days, whenever the machine is fixed, patients should be on the schedule since they are given appointments as if the machines are functioning.

It is clear from the report of Western's expert witness, CPA Israel Dominicci ("Dominicci") that there were significant outside referrals of MRI studies in Ponce and Carolina and CT Scan referrals in all three regions. Plaintiff's Exhibit 5, Exhibit

VIII.  SIF referred 3,275 MRI studies in the Ponce region to service providers other than Western and 4,743 MRI studies in the Carolina region to other providers.  With respect to CT Scans, SIF referred 114 studies in Mayagüez, 1,137 in Ponce and 595 in Carolina to providers other than Western.  SIF alleges that the outside referrals were primarily a result of Western's failure to maintain its equipment.  All of the witnesses at the trial testified that the various machines were out of service on various days based on equipment failure and other causes.  Dominicci calculated the down time of the various machines based on information supplied by SIF.  Neither Western nor SIF offered into evidence the daily or monthly sheets, which detail the equipment malfunctions.

Frances Torres Torres ("Torres"), SIF's radiologist supervisor for the Ponce region, indicated that she believed that the MRI was down  50% of the time and that the CT Scan was down 60% of time (dkt. #44, p. 53).  The number of out-of-service days determined by Dominicci, using the log books provided by SIF, shows that the Ponce MRI was out of service for 204 of the 342 working days during the time period at issue.  Plaintiff's Exhibit 5, Exhibit XII. Thus, according to Dominicci's calculations, the Ponce MRI was not functioning 59.65% of the time, somewhat more than suggested by Torres.  The numbers differ more significantly for the CT Scan. Dominicci calculates that the CT Scan was not functioning 108 of

11

the 342 days or 31.58% of the time, almost a 30% difference from the time suggested by Torres.  Id.

Norberto Perez Colon ("Perez"), SIF's radiology supervisor for the Mayagüez region was unwilling to guess as to the percentage of time that the CT Scan was down.  Perez testified as to the MRI not functioning, but this is not the subject of this controversy since Western is making no claim for damages related to the Mayagüez MRI. Perez testified that the CT Scan was out of order "a few times" (dkt. #44, p. 67).  Later, he testified that in three years, the CT scan malfunctioned "fifteen to twenty times approximately."  Id. at p. 68.  Dominicci determined that the CT Scan was not functioning 20 out of the 342 days or 5.85% of the time.  Plaintiff's Exhibit 5, Exhibit XII.  This largely correlates with the testimony of Perez and the loss attributable to the Mayagüez CT Scan is clearly the smallest portion of the claim.  Id.

George Enchautegui Ramos ("Enchautegui"), SIF's radiology supervisor for Carolina testified that the MRI was 40-50% operative (dkt. #44, p. 126).  Later, Enchautegui testified that the MRI was not working 40-50% of the time.  Id. at p. 134.  And he testified that the CT Scan was non-operative 30% of the time.  Id. at p. 126.

The out-of-service days determined by Dominicci show that the Carolina MRI was not working 197 out of 342 days or 57.60% of the time, which is completely in line with the testimony of Enchautegui.  Plaintiff's Exhibit 5, Exhibit XII.  As to the CT

12

Scan, Dominicci determined that this piece of equipment was not functioning 215 out of 342 days, or 62.87% of the time. Id. The calculations of Dominicci show that the CT Scan was non-operative twice the amount of time suggested by Enchautegui.

The Court is inclined to accept Dominicci's determination of the non-service days for equipment failures and other causes contained in Exhibit XI of Plaintiff's Exhibit 5. The Court adopts this conclusion because it was not refuted by SIF and because the testimony of the radiology supervisors is largely consistent with the numbers used by Dominicci. The Court notes that the radiology supervisors did not have full access to their log books while they testified to calculate the exact number of days that the MRI and CT Scans were not functioning. Moreover, most of the damages sought by the debtor relate to losses related to MRI tests and the testimony of the supervisors was very much in line with the numbers used by Dominicci. The estimation of the non-operating days of the Ponce CT Scan, while not consistent with the numbers used by Dominicci, nonetheless represent significantly less than 1% of the total damages. Although SIF contended that Dominicci's conclusions failed to take into account equipment breakdown or events outside of SIF's control, the Court concludes that the calculations include out-of-service days, whatever the nature of the cause. Thus, equipment failure can be used to explain why there were outside referrals, but it does not explain all of the outside referrals.

13

Other than equipment down time, Western alleged that their were insufficient technicians in Mayagüez and that SIF was not referring MRI tests that required the administration of contrast, which Western is capable of performing.  Dr. Irrizary testified that there were not enough technicians in Mayagüez to operate all of the machines at the same time.  SIF's radiology supervisor in Mayagüez, Perez, testified that there are usually two technicians and himself and he also performs services.  Because the MRI was not functioning during the period in question, the only modalities in Mayagüez were CT and Radiology.  Thus, accepting Perez's testimony, Mayagüez was adequately staffed, which makes it less plausible that SIF had legally adequate reasons for referring patients to providers other than Western, except when the equipment was not functioning.

Further, the Court accepts the testimony of Dr. Irrizary that he is able to perform tests with contrast and that simply making him aware of the scheduling of the appointments with contrast would allow him to be present to administer the tests and provide this service.

The Court concludes that SIF has failed to adequately explain why so many patients were scheduled for MRI and CT Scans with other service providers in Ponce and Carolina.  While Ponce was capable of conducting  approximately 40% of the MRI tests performed, less than 10% were performed at Western.  (Calculations made from data

14

contained in Plaintiff's Exhibit 5, Exhibits VII and XII). Likewise, Carolina was capable of approximately 42% of the MRI tests performed, but provided less than 13% of the MRI's. Id. With respect to CT Scans, Ponce was capable of approximately 68% of the CT Scans, but performed 26%. Mayagüez was capable of 94%, but performed 88%. Carolina was capable of 37%, but performed 23%. The Court concludes that Western has proven that SIF materially breached the Settlement Agreement by referring patients to outside providers in violation of the Settlement Agreement's exclusivity clause.

Likewise, the Court finds that Western has proven that it has suffered damages as a direct result of SIF's referral of patients to outside providers in direct contravention of the Settlement Agreement. In determining the estimated loss, the Court concludes that it must be reduced to reflect the time that the various machines were out of service. Moreover, the estimate must also take into account SIF's thirty percent (30%) service fee.

As indicated above, Western presented the testimony of Dominicci and a report of the estimated net loss suffered by Western as a result of SIF's breach of the Settlement Agreement (Plaintiff's Exhibit 5, Exhibit XI). At trial, Dominicci was qualified as an expert in public accounting. Dominicci's report of lost income was also admitted into evidence.

15

Experts, like Dominicci, are allowed to testify to their bare conclusion. Benzanson v. Fleet Bank, 29 F.3d 16, 22 (1st Cir. 1994)(citing Fed. R. Evid. 703). Pursuant to Federal Rules of Evidence 703 and 705, once expert opinion evidence is admitted, the Rules "place the full burden of exploration of facts and assumptions underlying the testimony of the expert witness squarely on the shoulders of opposing counsel's cross-examination." Newell Puerto Rico v. Rubbermaid, Inc., 20 F.3d 15, 20-21 (1st Cir. 1994) (quoting Smith v. Ford Motor Co., 626 F.2d 784, 793 (10th Cir. 1980)). In the present case, SIF did not produce its own expert nor a report to contradict the estimate of loss provided in Dominicci's report. SIF did argue that the methodology was flawed and attempted to introduce the testimony of Lerroy Lopez Morales to contradict Dominicci's testimony that both his and SIF's methodologies for the calculation of damages are correct.

The Court finds that Dominicci's report, although not audited, sufficiently established the existence of damages under the Civil Code. "The existence of damages should not be confused with the mode of determining the amount thereof, once it has been shown that damages exist and their proximate cause was an act or omission on the part of the defendant, the determination of the amount, even though it may be only approximate, should be upheld if it rests on a reasonable basis and not on mere speculation or guess." White Star Bus Line, Inc. v. Glenn Falls Indemnity, 60 D.P.R. 852, 861

16

(D.P.R. 1942) (citing Palmer v. Connnecticut Railway & Lighting Co., 311 U.S. 544, 560 (1941); Eastman Kodak Co. V. Southern Photo Materials Co., 273 U.S. 359 (1927)).

In the instant case, the Court finds that the information used by Dominicci for the loss calculation was based on information included in the confirmed plan and other information provided by SIF. The issue in this case is whether Dominicci's methodology properly accounts for the out-of-service days. SIF claims that the conclusions as to damages are based on an incorrect premise and calculated using an unreliable methodology. Dominicci considered the projected studies and subtracted the lesser of the number provided by Western or the total appointments recorded. This difference was then multiplied by the cost of a particular service in order to calculate a gross loss. See Plaintiff's Exhibit 5, Exhibit VIII. From gross loss, he subtracted a dollar amount representing non-service days for equipment failure and other causes. See Plaintiff's Exhibit 5, Exhibits XI and XII. To calculate the dollar amount to deduct, he multiplies the gross estimated loss by the percentage of time that the equipment was out of service. SIF contends, through argument of its legal counsel, rather than through an expert, that the correct methodology would be to take the projected or appointed studies, apply the percentage of time that the machine was not functioning to determine actual capability, then deduct actual services provided to determine lost

17

referrals.  After this, one would multiply by the cost for the service to arrive at the estimated net loss.

Since SIF did not provide an expert's report detailing how the calculations would differ, using the numbers included in Dominicci's report, the Court made the necessary calculations to determine whether the two methodologies yielded significantly different results.

No losses were claimed for the MRI in Mayagüez nor for Radiology in any of the three regions.[4]  The vast majority of the losses related to MRI services for Ponce and Carolina.

Related to the Ponce MRI, as indicated previously, non-service days composed 59.65% of the time period in question.  Thus, the MRI was only capable of performing 40.35% of the projected MRI studies.  There were 3,700 projected studies.  Deducting for down time, 3,700 minus 2,207, derived from multiplying the down time percentage by the projected studies, yields a capability of 1,493.  Western performed 425.  Thus, 1,068 MRI studies were appointed to other providers that could have been performed by Western.  At a cost of $650 per study, the loss would be $694,200.  Dominicci calculated a loss of $858,969 for the Ponce MRI.  Plaintiff's Exhibit 5, Exhibit XI.

---

[4]While the parties presented testimony as to when the MRI in Mayagüez was or was not functioning and as to the down time of X-Ray machines, since Western is making no claim for MRI service in Mayagüez nor for Radiology in any of the three regions, the testimony was not relevant to the dispute.

Related to the Carolina MRI, likewise as indicated previously, non-service days composed 57.60% of the time period in question. Thus, the MRI was only capable of performing 42.40% of the projected MRI studies. Western projected the performance of 5,550 MRI studies in Carolina. Deducting for down time, 5,550 minus 3,197, derived from multiplying the down time percentage by the projected studies, yields a capability of 2,353. Western performed 807 for a difference of 1,546. At a cost of $650 per study, the loss would be $1,004,900. Dominicci calculated a loss of $1,307,099 for the Carolina MRI. Plaintiff's Exhibit 5, Exhibit XI.

Thus, the total MRI net loss calculated by Dominicci is $2,166,068. As calculated using SIF's methodology, the estimated net loss would be $1,699,100 for a difference of $466,968.

Applying SIF's methodology to CT Scans, in Mayagüez non-service days composed 5.85% of the time period. Thus, Western could perform 94.15% of the appointed CT Scans, which at 1,073 were significantly less than the 3,700 projected. Western could have performed 1,010 and performed 959, leaving a short fall of 51 tests, at a cost of $227, for a loss of $11,577. Dominicci estimated this loss at $24,365. Plaintiff's Exhibit 5, Exhibit XI.

In Ponce, non-service days were 31.58% of the total days. Western could perform on 68.42% of the days. 1,538 were appointed and thus, Western was capable of performing 1,052. Western

19

performed 401, for a short of 651 CT Scans multiplied by $227 for a loss of $147,777.  Dominicci estimated this loss at $176,594.

Finally, in Carolina, there were 774 CT Scans, less than Western's capacity of 5,500.  After deducting for the 62.87% of the time that the CT was non-operational, Western was capable of performing 37.13% of the studies for a total of 287.  Western performed 179, for a shortfall of 108 at a cost of $227 per study, for a loss of $24,516.  Dominicci estimated this loss at $50,156.  Plaintiff's Exhibit 5, Exhibit XI.

Thus the total CT Scan losses using SIF's methodology would be $183,870 compared to Dominicci's estimate of $251,115.

Total losses for both MRI and CT Scan using SIF's methodology would be $1,882,970 versus the $2,417,183 estimated by Dominicci, for a difference of $534,213.

The Court will accept the methodology proposed by SIF because Dominicci testified that SIF's formula is valid and a logical way to calculate the loss.  Dkt. #43, p. 8.  Dominicci further testified that both methods are correct.  Id. at pp. 52-3, 59.  Nonetheless, as demonstrated throughout Dominicci's cross-examination and in SIF's closing arguments, the Court concludes that Dominicci's formula can show a false positive loss in the situation where none exists.[5]

---

[5]For example, if Western had the capacity to do 10,000 tests, performed 5,000, with 5,000 referred to other providers and the particular machine was out of service 50% of the time, there

Thus, the Court concludes that Western's net loss for all modalities in the three regions was $1,882,970, less the 30% service fee payable to SIF ($564,891) for a total loss of $1,318,079.

The Court concludes that Western has failed to prove damages for loss of commercial credibility. The testimony presented failed to provide a basis for the determination of any damages related to this concept.

Moreover, the Court concludes that there was no proof that SIF was negligent in its provision of security at the Ponce facility. The unrefuted testimony was that the Ponce facility has 24 hour security. Torres testified that the lock on the door of the trailer in which the MRI is located was broken and that Dr. Irrizary was informed of this situation. Dkt. #44, p. 19. Moreover, SIF claims that Western is being reimbursed through its insurance for its covered loss, which was not refuted by Western. The Court will not award damages due to Western's allegation that SIF was negligent in the provision of security at the Ponce facility.

---

should be no damages. If the machine was not functioning 50% of the time, the actual capacity would also be 50% or 5,000. Using Dominicci's approach, one would deduct tests performed from capacity, arriving at 5,000 and then multiply by the percentage of time that the machine was out of service, to arrive at the number of outside referrals in violation of the settlement agreement. In this case it would be 2,500 tests, which would then be multiplied by their cost to arrive at a positive and significant estimated loss.

CONCLUSION

Western has proven that SIF materially breached the Settlement Agreement by referring patients to outside providers in direct contravention of the Settlement Agreement's exclusivity clause. Moreover, Western has proven that it suffered damages in the form of lost revenues in the amount of $1,318,079.  Western has failed to prove damages for loss of commercial credibility.  Western also failed to prove that SIF was negligent in its provision of security at the Ponce facility.

ORDER

WHEREFORE, it is ORDERED and ADJUDGED that SIF pay Western damages in the total amount of $1,318,079.

SO ORDERED.

San Juan, Puerto Rico, this 29th day of December, 2006.


s/Gerardo A. Carlo

_____
Gerardo A. Carlo
U.S. Bankruptcy Judge

Excess*include*
*The appointment process, as explained by SIF, was controverted
by Dr. Irrizary, who testified that when a particular machine is
not functioning, there could be a delay of days or a week before
the patients return. *cite*  The Court accepts this testimony, as
the only plausible explanation offered, for why such a large
percentage of studies are referred to other providers.
Obviously, acceptance of this explanation demonstrates a breach
of contract by SIF.
*SIF failed to provide anything other than anecdotal evidence.
SIF did not provide a basis for a calculation nor a deduction for
legitimate referrals to other providers, other than for referrals
based on equipment failure.